## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**UNITED STATES OF AMERICA**     )

                              )     **CRIMINAL ACTION NO.**

       **v.**                      )     **1:15-CR-400-MHC/AJB**

                              )

**DEAMONTE KENDRICKS,**         )

       **Defendant.**             )

## UNITED STATES MAGISTRATE JUDGE'S ORDER
## AND FINAL REPORT AND RECOMMENDATION

Deamonte Kendricks ("Kendricks" or Defendant") is charged in an indictment with possessing a Romarm/Cugir 7.62 x39 mm semi-automatic rifle and a Smith & Wesson .40 caliber pistol after having previously been convicted of a felony offense, in violation of 18 U.S.C. § 922(g)(1). [Doc. 12]. He moved to suppress evidence, [Doc. 19], statements, [Doc. 20], and the fruits of the search of his cell phone, [Doc. 30]. The Court held an evidentiary hearing on the first two motions. [Doc. 42 (hereinafter "T__")]. The parties fully briefed the pending issues. [Docs. 34 (Gov't), 40 (Kendricks), 41 (Gov't)]. In his post-hearing brief, Kendricks withdrew his motion to suppress as to the firearms, [Doc. 19]. [*See* Doc. 40 at 1]. For the following reasons, the undersigned **RECOMMENDS** that the remaining motions be **DENIED**.

## I.     Motion to Suppress Statements, [Doc. 20]

### A.     Facts

Kendricks was arrested on October 1, 2015, following his flight from a vehicle containing his cell phone and the two firearms with which he is charged.[1] T26-28, 31, 35-37; Gov't Exhs. 8-11.  The arresting officers swore out arrest warrants charging him with violating O.C.G.A. § 16-13-30 (violation of the Georgia Controlled Substances Act) (two counts); O.C.G.A. § 40-6-390 (reckless driving); O.C.G.A. § 16-8-7 (theft by receiving stolen property); O.C.G.A. § 16-11-106 (possession of a firearm during the commission of a felony); O.C.G.A. § 16-10-24 (willful obstruction of a law-enforcement officer); O.C.G.A. § 40-6-395 (fleeing and attempting to elude a police officer); O.C.G.A. § 16-15-4(a) (unlawful association with a criminal street gang to conduct or participate in a felony); and several traffic laws.  [Doc. 34-1].[2]

---

[1]     Other items, including Kendricks's identification card, also were seized.

[2]     Subsequently, Kendricks also was charged with conspiracy to commit a crime (O.C.G.A. § 16-4-8) and possession of a firearm by a convicted felon (O.C.G.A. § 16-11-131).  Fulton County Superior Court Register of Actions, Case No. 15SC140116 (hereinafter, "Register"), *available at* http://justice.fultoncountyga.gov/PASupCrtCM/CaseDetail.aspx?CaseID=7050558 &ShowAllCharges=1 (last visited 08/14/2016).

(continued...)

2

On October 2, 2015, the Metro Conflict Defender filed an "Entry of Appearance & Assertion of Rights" on behalf of Kendricks, asserting, in part, his rights under the Fifth and Sixth Amendments to remain silent and not incriminate himself, and his right to counsel. Def. Exh. 1; [*see also* Doc. 40-2]. He appeared before a judge in the county jail that same date. Register, at 1. The record does not contain any other information as to what transpired at Kendricks's initial appearance in state court.

On October 6, 2015, Atlanta Police Department ("APD") Homicide Unit Detective Jim Thorpe, Jr., transported Kendricks from the Fulton County Jail to APD headquarters, where Kendricks was questioned by Thorpe and two members of the APD Gang Intelligence Unit. T51, 55-56, 57; Gov't Exh. 15. During the questioning, another homicide detective, Detective Joe Golphin, came into the room to ask Kendricks about a shooting at a nightclub. T63-64. The interview was video-recorded. Gov't Exh. 15. Kendricks did not tell Thorpe that he had a lawyer, nor did he ask for

---

[2](...continued)
    The Court can take judicial notice of state court dockets. Fed. R. Evid. 201; *see McDowell Bey v. Vega*, 588 Fed. Appx. 923, 926 (11th Cir. Oct. 17, 2014) (citing with approval *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (noting a judge permissibly looked at docket sheets in ruling on motion to dismiss because "docket sheets are public records of which the court could take judicial notice"); *United States v. Mercado*, 412 F.3d 243, 247-48 (1st Cir. 2005) (taking judicial notice of state-court docket entries)). *Cf. Coney v. Smith*, 738 F.2d 1199, 1200 (11th Cir. 1984) (taking judicial notice of state court proceedings for first time on appeal).

3

one.  T52-53, 91-92.  However, Thorpe testified that he knew that Kendricks had his first appearance in court and that he already was represented by counsel, although he had not seen the entry-of-appearance form.  Def. Exh. 1; T88-89.  Thorpe read Kendricks his *Miranda* rights from a preprinted form.  Gov't Exh. 16.  Kendricks read the form and then signed it, thereby agreeing to be questioned without having a lawyer present during the questioning.  T59-61; Gov't Exh. 15 at 21:19.

The form provided in relevant part:

### WAIVER OF COUNSEL BY DEFENDANT IN CUSTODY

I, **_KENDRICKS, DEAMONTE (d.o.b.-11/12/1992)_**    HAVE BEEN INFORMED BY THE UNDERSIGNED LAW ENFORCEMENT OFFICERS, PRIOR TO BEING QUESTIONED BY THEM, THAT I AM SUSPECTED OF THE OFFENSE OF    **MURDER 16-5-1**    IN FULTON COUNTY, STATE OF GEORGIA, ON THE  **_10th_** DAY OF  **_JANUARY_**    19  ,  OR 20**_15,_**  AND HAVE BEEN INFORMED BY THEM OF MY CONSTITUTIONAL RIGHT, AS FOLLOWS:

    (1)   THAT I MAY REMAIN SILENT AND DO NOT HAVE TO MAKE ANY STATEMENT AT ALL.

    (2)   THAT ANY STATEMENT THAT I MAKE MAY BE USED AGAINST ME IN A COURT OF LAW.

    (3)   THAT I HAVE THE RIGHT TO CONSULT WITH AN ATTORNEY BEFORE MAKING ANY STATEMENT AND TO HAVE SAID ATTORNEY PRESENT WITH ME WHILE I AM MAKING A STATEMENT.

4

    (4)    THAT IF I DO NOT HAVE ENOUGH MONEY TO EMPLOY AN ATTORNEY, I HAVE THE RIGHT TO HAVE ONE APPOINTED BY THE COURT TO REPRESENT ME; TO CONSULT WITH HIM OR HER BEFORE MAKING ANY STATEMENT, AND TO HAVE HIM OR HER PRESENT WITH ME WHILE I AM MAKING A STATEMENT.

    (5)    THAT IF I REQUEST AN ATTORNEY, NO QUESTIONS WILL BE ASKED OF ME UNTIL AN ATTORNEY IS PRESENT TO REPRESENT ME.

AFTER HAVING MY CONSTITUTIONAL RIGHTS EXPLAINED TO ME, I FREELY AND VOLUNTARILY WAIVE MY RIGHT TO AN ATTORNEY.  I AM WILLING TO MAKE A STATEMENT TO THE OFFICERS.

I (CAN) (~~CANNOT~~) READ AND WRITE THE ENGLISH LANGUAGE AND FULLY UNDERSTAND MY CONSTITUTIONAL RIGHTS TO AN ATTORNEY.

I (HAVE READ), I (~~HAVE NOT READ TO ME~~) THIS WAIVER OF COUNSEL AND FULLY UNDERSTAND IT.

NO THREATS OR PROMISES HAVE BEEN MADE TO ME TO INDUCE ME TO SIGN THIS WAIVER OF COUNSEL AND TO MAKE A STATEMENT TO THE OFFICERS.

THIS  _6th_  DATE OF **_OCTOBER_**  19 _,_ Or 20 _**15,**_   TIME  _12:17_

_x s/ Deamonte Kendricks_

Gov't Exh. 16.  Thorpe wrote on the form that Kendricks went through the twelfth

grade at Grady High School, and he later testified that Kendricks reported that he

AO 72A
(Rev.8/8
2)

graduated from high school but was not sure of the year.  T61-62.  Kendricks placed

the initials "DK" to the right of each of the paragraphs numbered (1) through (5).  *Id.*

Although the charges pending against Kendricks were as listed at the beginning

of this fact section, Thorpe filled in "Murder" only on the *Miranda* form because it was

the most serious offense about which the detectives wanted to question

Kendricks.  T60.  Kendricks was provided something to eat and drink.  T55

About two and one-half hours into the questioning, while Kendricks was being

questioned by Thorpe and Golphin, Kendricks announced that he wanted to talk to "my

lawyer" and "I don't want to talk no more."  Gov't Exh. 15 at 02:23:22; T64-65.  There

were no further questions, and the session ended at 2:25 p.m.  Gov't Exh. 15 at 2:24:54.

 Thorpe then escorted Kendricks to the sally port to smoke a cigarette, and while there,

Kendricks volunteered that he would continue to talk to Thorpe as long as Golphin was

not present.  T65-67.  Thorpe took Kendricks back to the interview room, where

Kendricks was provided with a fast food sandwich because he had missed lunch at the

jail.  T68-70.  When the detectives re-entered the interview room, Thorpe recounted the

sally port conversation for the recording; Kendricks acknowledged that he wanted to

continue the questioning without a lawyer as long as Golphin was not present.  T67-68,

71; Gov't Exh. 15 at 03:04:50-03:05:58.  The questioning then resumed and later ended

AO 72A
(Rev.8/8
2)

when the detectives had no further questions.  T72; Gov't Exh. 15 at 04:18:31.

Kendricks did not ask for a lawyer or seek to stop the questioning during the balance

of the interview.  T71-72.

On October 12, 2015, Thorpe again picked up Kendricks from the Fulton County

Jail and transported him to APD headquarters for additional questioning.  T73-74.

Thorpe was not contacted in between the two interviews by any lawyer on behalf of

Kendricks, nor did Kendricks request a lawyer during the subsequent questioning.  T75.

The second questioning session also was video-recorded.  T75-76; Gov't Exh. 17.

Kendricks was provided with food and drink.  T81.  During the subsequent questioning,

at least one other investigator was present at all times in addition to Thorpe.  Thorpe

read an identical *Miranda* rights and waiver form to Kendricks as he had on October 6,

and as he had done in the earlier interview, Kendricks appeared to read the form,

initialed the individual rights, and signed the waiver.  T77-78; Gov't Exh. 18; *see also*

Gov't Exh. 17 at 04:05-08:04.  While being asked if he was willing to waive his rights,

Kendricks asked if this meant he would never have a lawyer, and Thorpe told him that

if he wanted a lawyer during questioning, they would stop the questioning.  T79;

Gov't Exh. 18 at 06:39-06:43.  Kendricks stated he was willing to talk without a lawyer

being present.  Gov't Exh. 18 at 06:47-:56.  He did not tell the detectives that he had

a lawyer.  T93.  During this questioning, Kendricks was told that if he cooperated, they would see what they could do to help him out.  T87.  The interview lasted about two and a half hours.  Gov't Exh. 02:23:46.

During both interviews Kendricks made admissions about the firearms that the Government seeks to introduce at trial.  T96.

**B.      Arguments of the Parties**

The Government argues that the entry of appearance and assertion of rights contained in the Metro Conflict Defenders' October 2, 2015 entry of appearance did not preclude the detectives from questioning Kendricks, as long as he voluntarily, knowingly, and intelligently waived his rights to counsel and to not incriminate himself.  [Doc. 34 at 27 (citing *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009); *North Carolina v. Butler*, 441 U.S. 369, 374 (1979))].  It argues that even if a defendant has counsel, law enforcement still can approach and question him if he voluntarily waives his Sixth Amendment rights.  [*Id.* at 28 (citing *United States v. Rojas*, 553 Fed. Appx. 891, 892 (11th Cir. Jan. 23, 2014))].  The Government contends that Kendricks voluntarily waived his *Miranda* rights prior to both interviews in the same way the defendant in *Rojas* waived his—by being informed of them, verbally affirming his understanding, and signing a *Miranda* form.  It submits that, as in *Rojas*, the fact

8

that counsel for Kendricks had made an entry of appearance did not preclude police from approaching Kendricks to request an interview, nor did it preclude Kendricks from subsequently voluntarily waiving his right to counsel.  [*Id.* at 29].  It also argues that *Kirby v. Illinois*, 406 U.S. 682 (1972), does not establish a blanket rule against any contact by police with a defendant following the commencement of formal proceedings against him.  [*Id.* at 29-30].

The Government next argues that, although Kendricks invoked his rights during the October 6 interview, he initiated the request to restart the interview in the sally port and that restarting the interview was not law enforcement's idea.  [*Id.* at 30-31].

In response, Kendricks argues that his Sixth Amendment right to counsel had attached with the commencement of adversary judicial proceedings against him, counsel had been appointed to represent him, and his counsel invoked his rights and advised the state courts and the district attorney by such filing.  [Doc. 40 at 4-6].  He contends that because his right to counsel attached upon the start of adversary proceedings against him, the right is not dependent upon a request from him, and he argues that the courts " 'indulge in every reasonable presumption against waiver.' "  [*Id.* at 6 (quoting *Stokes v. Singletary*, 952 F.2d 1567, 1577 (11th Cir. 1992), and *Brewer v. Williams*, 430 U.S. 387, 404 (1977))].  He further points out that in

9

*Brewer*, counsel invoked his client's rights, which later led to the grant of the habeas petition due to the violation of the defendant's Sixth Amendment rights.  [*Id.* at 6 (citing *Brewer*, 430 U.S. at 391, 393, 405)].

Kendricks argues that his right to counsel therefore attached, and any subsequent waiver is deemed invalid under *Michigan v. Jackson*, 475 U.S. 625 (1986).  [Doc. 40 at 7].  Kendricks acknowledges that the Government relies on *Montejo*, which overruled *Jackson*, but he argues that *Montejo* "defies all prior analysis in Supreme Court cases discussing the importance of the shift from being suspect to an accused, the importance of the initiation of the adversary process, and the fundamental difference between the Fifth and Sixth Amendments," [Doc. 40 at 7], and it should therefore be narrowly read to mean only that when a person is formally accused of a crime, a subsequent *Miranda* waiver should not be presumed to be invalid.  [Doc. 40 at 7-8].  Although he acknowledges that in *dicta* the *Montejo* opinion noted that a *Miranda* warning would often "'do the trick'" in showing a valid waiver, [*id.* at 7 (quoting *Montejo*, 556 U.S. at 786)], he contends that, in this case, the following facts show that his *Miranda* waiver was ineffectual: (1) the assertion of his rights by counsel in the entry of appearance (which notice is imputed to the detectives), (2) he was told that if he cooperated, the officers would see what they could do for him,

10

T82, (3) he invoked his rights during the first interview, T63, and (4) there were conversations between him and Thorpe during transport and in the sally port that were not recorded; and, thus, the totality of circumstances point distinctly against finding a valid waiver. [*Id.* at 8]. He also argues that *Montejo* was wrongly decided. [*Id.* at 9].

Finally, Kendricks argues that the Court should not rely upon the Eleventh Circuit's unpublished *Rojas* decision because the opinion is not clear as to when the defendant in that case was interrogated, that is, whether he was questioned before or after he appeared in court on the indictment. [*Id.* at 8-9].

In reply, the Government distinguishes *Brewer* on the grounds that in that case, law enforcement and defense counsel agreed that the defendant would not be questioned and the defendant never told law enforcement that he wished to be questioned without his lawyer present. [Doc. 41 at 3-4 (citing *Brewer*, 430 U.S. at 391, 403, 405)]. The Government argues that, in this case, unlike in *Brewer*, there is no evidence of a meeting between Kendricks's lawyer and law enforcement, nor an agreement between defense counsel and law enforcement that he would not be questioned, and that Kendricks did not continue to rely on his lawyer but in fact agreed to speak to the detectives without a lawyer being present. [*Id.* at 4]. The Government also points out that *Montejo* overruled *Jackson*, stating that *Jackson*'s holding—that no

11

represented defendant can ever be approached by law enforcement for a consensual interview—is " 'off the mark.' "  [*Id.* at 5 (quoting *Montejo*, 556 U.S. at 789)].[3]

The Government further argues that in *Rojas*, the Eleventh Circuit recognized that  obtaining counsel is not an automatic invocation of a defendant's Sixth Amendment rights, and it argues that the timing of Rojas's court appearance was not relevant to the Eleventh Circuit's decision that despite retaining counsel, Rojas could voluntarily, knowingly, and intelligently waive counsel's presence.  [*Id.* at 6].

The Government next argues that Kendricks's waivers were knowing and intelligent, because the record established that he could read and write, he was not under the influence of alcohol or drugs, and he was advised of and waived in writing his *Miranda* rights before each questioning session. [*Id.* at 7-8 (citing T61, 62, 78, 79)]. It also contends that contrary to Kendricks's argument, *Montejo* provides that typically a *Miranda* waiver is sufficient evidence that a right to counsel was properly waived, characterizing this portion of the opinion not as *dicta* but as "instructive."  [*Id.* at 8].

---

[3]      The Government also argues that even if *Jackson* still was good law, it held that a waiver was invalid after the defendant invokes his right to counsel, not just after the right to counsel attaches.  [Doc. 41 at 5 (citing *Jackson*, 475 U.S. at 635)]. Thus, it argues, since the record merely supports a finding that the state court appointed counsel, not that Kendricks asserted his right to counsel, *Jackson* does not mandate a different outcome.  [*Id.*].

12

The Government also contends that Kendricks voluntarily waived his rights. There was no coercion, and Kendricks was fed and given bathroom breaks. [*Id.* (citing T55, 68, 69, 80, 81; Gov't Exh. 15 at 1:56:04-1:57:12; Gov't Exh. 17 at 08:40-09:17, 10:31-13:30, 30:45)]. In addition, the Government argues that the detectives neither threatened Kendricks nor promised him a benefit for answering their questions. [*Id.* (citing T52, 63, 64, 67, 72, 73, and *generally* Gov't Exhs. 15-18)]. It further denies that one detective's statement to Kendricks that if he cooperated they would see what they could do did not amount to badgering or a promise, because the statement did not promise a particular outcome or reduction in sentence, noting that the Eleventh Circuit has held that a statement by police that a suspect's cooperation would be passed along to judicial authorities and would probably be helpful to him is not a sufficient inducement to make a statement involuntary. [*Id.* at 8-9 (citing *United States v. Graham*, 323 Fed. Appx. 793, 800 (11th Cir. Apr. 20, 2009))].

The Government next argues that no Sixth Amendment violation occurred on October 6 when the questioning resumed after Kendricks's invocation, because the record shows that Kendricks initiated the resumption of questioning while he and Thorpe were in the sally port, and although that conversation was not recorded, Thorpe recounted the conversation once back in the interview room, and Kendricks agreed to

13

Thorpe's recitation of events. [*Id.* at 9-10 (citing T68; Gov't Exh. 03:03:58-03:05:57)].

The Government argues that Kendricks acknowledged in his brief that a defendant can legitimately re-initiate questioning following an invocation, [*id.* at 10 (citing [Doc. 40 at 6])]; and since the unrecorded conversations between Thorpe and Kendricks were confirmed on the recording, no Sixth Amendment violation occurred. [*Id.*].[4]

### C.     Discussion

The Government has the better arguments. The Sixth Amendment provides that in all criminal prosecutions, "the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. Once the right to counsel attaches, the accused is entitled to counsel during any "critical stage" of the post-attachment proceedings. *Rothgery v. Gillespie Cnty.*, 554 U.S. 191, 212 (2008); *United States v. Griffin*, 515 Fed. Appx. 820, 823 (11th Cir. Apr. 4, 2013). The right to counsel attaches in a criminal prosecution after the initiation of adversarial judicial

---

[4]     The Government also argues for the first time in its reply brief that if Kendricks is deemed to have invoked his right to counsel by the entry of appearance, then that invocation is valid only as to the state charges and not to the federal charges he now faces. [Doc. 41 at 11-12]. The Government acknowledges that this argument was presented in a reply brief and therefore had no objection to Kendricks filing a surreply, [*id.* at 11 n.2]. Be that as it may, the Court will not consider the Government's argument. Arguments which are first raised in a reply brief are deemed waived. *United States v. House*, 684 F.3d 1173, 1210 (11th Cir. 2012).

14

proceedings. *Kirby v. Illinois*, 406 U.S. 682, 689-90 (1972). Certainly Kendricks's appearance on the state warrants before a state court judge on October 2, 2015 constitutes the initiation of adversarial judicial proceedings. And, in any event, pretrial custodial interrogation is a critical stage of pretrial proceedings. *Stano v. Dugger*, 921 F.2d 1125, 1140 (11th Cir. 1991) (citing *Miranda v. Arizona*, 384 U.S. 436 (1966)). The defendant has the burden of proving that he invoked his Sixth Amendment right to counsel. *Koras v. Robinson*, 123 Fed. Appx. 207, 212 (6th Cir. Feb. 15, 2005) ("The Supreme Court's decision in *Davis* [*v. United States*, 512 U.S. 452, 458-59 (1994),] indicates the burden is on the defendant to prove that he clearly invoked his right to counsel in the first instance.").

*Montejo* compels rejection of Kendricks's arguments. In that case, the Supreme Court overruled *Jackson*. *Montejo*, 556 U.S. at 797. While Kendricks contends that *Montejo* was wrongly decided, this Court is not empowered to disregard a Supreme Court decision. *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) (explaining that lower courts must "follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions."); *City of Miami v. Wells Fargo & Co.*, 801 F.3d 1258, 1266 (11th Cir. 2015).

In *Montejo*, the Supreme Court held that a represented defendant can be

15

approached by law enforcement and questioned without a lawyer being present, so long as he knowingly, intelligently, and voluntarily waives his right to counsel and he had not previously invoked his right to be questioned only in the presence of counsel:

> [A] defendant may waive his Sixth Amendment right to counsel, "so long as relinquishment of the right is voluntary, knowing, and intelligent." *Montejo*, 556 U.S. at 786[ ]. "The defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled." *Id.* Further, a defendant's valid waiver of his *Miranda* rights generally amounts to a waiver of his Sixth Amendment right to counsel. *Id.* However, once a defendant clearly invokes his right to counsel, authorities may not interrogate him (1) until counsel is made available, or (2) unless the defendant initiates the contact; any waiver obtained prior to the occurrence of at least one of those events is invalid. *Edwards v. Arizona*, 451 U.S. 477, 485-87[ ] (1981) (discussing right to counsel under *Miranda* ).

*Rojas*, 553 Fed. Appx. at 893.[5]

---

[5]     Although *Rojas* is an unpublished decision and thus is not considered binding precedent, the Court treats it as persuasive authority. *See Lanier Constr., Inc. v. Carbone Props. of Mobile, LLC*, 253 Fed. Appx. 861, 865 n.5 (11th Cir. Nov. 8, 2007) ("Pursuant to Eleventh Circuit Rule 36-2, unpublished opinions are not considered binding precedent, but may be cited as persuasive authority."). The Court finds *Rojas* persuasive because the facts are very similar to the present case. In *Rojas*, the defendant was indicted and retained counsel. He self-surrendered on the indictment without his lawyer being present, was approached about giving a statement by law enforcement, signed a *Miranda* waiver form, and gave a statement about the charges. *Rojas*, 553 Fed. Appx. at 892. In affirming the denial of his motion to suppress, the Eleventh Circuit held that Rojas failed to sufficiently invoke his right to have his attorney present at the post-arrest interview before the questioning began. "Rojas presented no evidence, and does not assert on appeal, that he expressly

(continued...)

16

In the present case, although counsel was appointed for Kendricks at the Fulton County Jail, there was no evidence that Kendricks himself invoked his right to counsel such that law enforcement officers were prohibited from approaching and questioning him following a knowing, intelligent, and voluntary waiver of counsel's presence. *Rojas*, 553 Fed. Appx. at 894 ("Although [Rojas] argues that his pre-arrest retention of an attorney was a standing invocation of his right to counsel, the argument fails under *Montejo*.") (citing *Montejo*, 556 U.S. at 789 (holding that just because a defendant is represented by counsel does not mean police are precluded from approaching defendant and seeking defendant's consent to interrogation)). The *Rojas* court also observed that *Montejo* emphasized a defendant's ability to clearly assert, and thus sufficiently safeguard, his right to counsel at any critical stage following indictment, and it rejected the notion that the acquisition of counsel affected the ability or rendered it irrelevant. *Rojas*, 553 Fed. Appx. at 893-94 (citing *Montejo*, 556 U.S. at 786). Thus, the mere fact that Kendricks was appointed counsel did not prevent law enforcement from approaching and asking if he was willing to waive his

---

[5](...continued)
requested his counsel's presence for the interview. Although he argues that his pre-arrest retention of an attorney was a standing invocation of his right to counsel, the argument fails under *Montejo*." *Rojas*, 553 Fed. Appx. at 893 (citation omitted).

17

right to counsel and answer questions. *United States v. Gonzalez-Lauzan*, 437 F.3d 1128, 1139-40 (11th Cir. 2006) (assuming that attorney represented defendant at time of interview, defendant's participation in interview without presence of counsel did not violate Sixth Amendment where his *Miranda* waiver was knowing and voluntary).

Moreover, the Conflict Defenders' assertion of Kendricks' Fifth and Sixth Amendment rights in the entry-of-appearance form is ineffective, because *Miranda* rights cannot be invoked anticipatorily. *United States v. Grimes*, 147 F.3d 1342, 1348 (11th Cir. 1998) (where defendant was arrested and signed a form prepared by his public defender purporting to assert his right to counsel under the Sixth Amendment and his rights to remain silent and to counsel under the Fifth Amendment, court held that "*Miranda* rights may be invoked only during custodial interrogation or when interrogation is imminent" and thus defendant's earlier execution of the claim-of-rights form was insufficient to invoke his *Miranda* rights). If the *Grimes* defendant's personal assertion of his rights prior to undergoing custodial interrogation was ineffective, then the Conflict Defenders's purported invocation on Kendricks's behalf likewise was ineffective to invoke Kendricks's rights to counsel and to remain silent.

18

Having concluded that Kendricks's right to counsel attached upon the start of the state-court proceedings against him but that the Conflict Defenders' entry of appearance was not a legally valid invocation of Kendricks' rights to counsel and remain silent, the question remains whether Kendricks properly waived his rights before being subjected to custodial interrogation.  In this case, Kendricks properly waived his rights to counsel and to not incriminate himself at the beginning of the questioning on both October 6 and 12.

The Government must prove by a preponderance of the evidence that the defendant waived his rights knowingly and voluntarily.  *United States v. Glover*, 431 F.3d 744, 748 (11th Cir. 2005).  An accused effectively waives his *Miranda* rights if he: (1) voluntarily relinquishes them as the product of a free and deliberate choice, rather than through intimidation, coercion or deception; and (2) makes his decision with a full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them.  *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995).  A waiver is effective where the totality of the circumstances reveals both an uncoerced choice and the requisite level of comprehension.  *United States v. Wright*, 300 Fed. Appx. 627, 632 (11th Cir. Nov. 12, 2008) (citing *Barbour*, 70 F.3d at 585).  The Government has the burden to show by a preponderance of the

19

evidence that the defendant made a knowing, voluntary, and intelligent *Miranda* waiver. *United States v. Farris*, 77 F.3d 391, 396 (11th Cir. 1996). "An express written or oral statement of waiver . . . is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." *Butler*, 441 U.S. at 373; *United States v. Johnson*,  379 Fed. Appx. 964, 967-68 (11th Cir. May 24, 2010).

In this case, Kendricks was advised of his rights to counsel and to remain silent in writing at the commencement of questioning on both October 6 and October 12, and the video-recording of each session showed that he read the warnings, initialed each one denoting that he understood them, and signed the waiver of his rights.  In addition to the video appearing to show him reading the rights forms, the record shows that he had a twelfth-grade education.  Thus, Kendricks was advised of his rights, knew what rights he had, and had sufficient intelligence to waive them.   Generally, a *Miranda* warning is sufficient for a Sixth Amendment waiver to be "knowing and intelligent." *See generally Patterson v. Illinois*, 487 U.S. 285, 293-94 (1988); *see also Montejo*, 556 U.S. at 786 (noting that a counseled defendant may waive counsel so long as the waiver is voluntary, knowing, and intelligent, and stating that "when a defendant is read his *Miranda* rights (which include the right to have counsel present during

20

interrogation) and agrees to waive those rights, that typically does the trick, even though the *Miranda* rights purportedly have their source in the *Fifth* Amendment") (emphasis in original).  To the extent that this statement in *Montejo* is dicta, the Eleventh Circuit has held that " 'dicta from the Supreme Court is not something to be lightly cast aside.' " *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006) (citations omitted).  Thus, the waiver forms from both the October 6 and 12 interrogations demonstrate that Kendricks waived his rights to counsel and to remain silent knowingly and intelligently.

In addition, that Kendricks invoked his rights to stop answering questions and consult with counsel during the October 6 session demonstrates that he understood that he possessed those rights and could exercise them at any time during the questioning. *See United States v. Pacheco-Lopez*, 531 F.3d 420, 432 (6th Cir. 2008) ("Indeed, by invoking his right to silence, defendant Pacheco-Lopez conveyed this understanding in the clearest, most unequivocal way possible that he understood his right to do so."); *United States v. Allen*, 247 F.3d 741, 766 (8th Cir. 2001) (noting that defendant's invocation of his right to counsel is "strong evidence" that defendant understood his rights), *vacated on other grounds* 536 U.S. 953 (2002); *Pickens v. Gibson*, 206 F.3d 988, 995 (10th Cir. 2000) (noting that invocation of a *Miranda* right

21

demonstrates a defendant's understanding of that right); *United States v. Goodale*, No. 12-CR-3011-LRR, 2012 WL 1965600, at *4 (N.D. Iowa May 31, 2012) ("Defendant demonstrated that he understood his rights by invoking his right to remain silent approximately ten minutes into the interview."), *aff'd*, 738 F.3d 917 (8th Cir. 2013).

Further, Kendricks's waiver of his *Miranda* rights was voluntary. There was no evidence that the waivers he executed on October 6 or 12 were the product of any coercion, deception, or intimidation. The detectives identified themselves to Kendricks. He was told the most serious crime that the detectives were investigating. The law-enforcement officers were not armed during the questioning sessions, and other than to secure Kendricks to the interview room floor with a leg chain and to apply or remove handcuffs, there is no evidence that they touched him. The rights were read to Kendricks at the beginning of each occasion in a conversational tone, and he was allowed to read the rights himself. He was not subject to any deception about the nature of his rights.

Finally, as will be discussed in more detail *infra*, Kendricks's decision to, in effect, waive his rights and begin answering questions again after he invoked on October 6 was also voluntary. When Kendricks did invoke his rights, the questioning

22

stopped.  Moreover, the record is undisputed that, in the sally port, Kendricks initiated the conversation with Thorpe about resuming the questioning as long as Golphin was not present.  Then, Kendricks confirmed Thorpe's recounting of this unrecorded incident once they were back in the interview room, and indicated that he wanted to continue to answer questions without an attorney being present, as long as Golphin was not present.  Thus, it is clear that Kendricks voluntarily waived his *Miranda* rights in that instance as well.

In addition to proving a defendant's in-custody statements were obtained in compliance with the dictates of *Miranda*, the Government also must show that the defendant's statements were otherwise voluntary.  *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *Miranda*, 384 U.S. at 475.  Here, the Government has satisfied this burden as well.  The primary focus of the voluntariness inquiry is whether there has been police overreaching.  *United States v. Bernal-Benitez*, 594 F.3d 1303, 1319 (11th Cir. 2010).  The Court looks to the totality of the circumstances to determine whether a confession was voluntary, "including the details of the interrogation and the defendant's characteristics."  *Id.* Ultimately, the question is whether the defendant "made an independent and informed choice of his own free will, possessing the capability to do

23

so, his will not being overborne by the pressures and circumstances swirling around him." *United States v. Rouco*, 765 F.2d 983, 993 (11th Cir. 1985) (citation and quotations omitted).  Among the factors to consider are the defendant's education and intelligence, the length of detention, the length of questioning, whether coercive interrogation techniques were used, and whether the defendant was advised of his constitutional rights.  *Id.*

First, the record shows that Kendricks had the intelligence to decide whether or not to answer the detectives' questions.  He had a high-school education and could read and write.  Also, the fact that Kendricks exercised his right to stop answering questions shows that he understood the choices he had (and that he was not coerced into answering questions).  *Cf. United States v. Andaverde*, 64 F.3d 1305, 1313 (9th Cir. 1995) (implying waiver where a defendant did not invoke his rights, then initiated a conversation, and later did invoke his rights).  Second, although Kendricks had been in custody for four days by the time he was questioned on October 6 and almost eleven days by the time of the second session on October 12, his custodial status alone does not render his statements involuntary.  *United States v. Francisco-Gutierrez*, 249 Fed. Appx. 135, 141-42 (11th Cir. Sept. 21, 2007) ("The mere fact that Gutierrez was in police custody when he gave his statement does not, alone, establish coercion.")

24

(citing *United States v. Thompson*, 422 F.3d 1285, 1296 (11th Cir. 2005) (explaining that a finding of involuntariness under the Fifth Amendment's Due Process Clause requires as a prerequisite coercive government conduct such as "subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces the confession" (quotation marks omitted))).

Third, although the interrogation sessions were not short in duration (October 6 (around four hours total), October 12 (around two and one-half hours total)), the questioning took place during the daytime; Kendricks was able to order food through the detectives and go to the restroom; and the questioning took place in a conversational tone.  Fourth, there was no physical force or threat to apply force.

Finally, the two specific incidents that Kendricks claims made his statements involuntary (aside from the *Montejo/Jackson* claim)—that is, his being questioned upon return from the sally port after invoking his rights, and the detective's statement implying assistance for cooperation—do not individually or jointly constitute coercion sufficient to support a finding that his statements were involuntary.  As to the invocation two and one-half hours into the October 6 questioning, the record is undisputed that following Kendricks's invocation of his rights during this session, the

25

questioning stopped.  Kendricks asked Thorpe if he could smoke a cigarette before he was taken back to jail, and Thorpe granted that request after Kendricks asked again. T64, 66.  Thorpe took him down to the sally port and told him that he would be transported back to the Fulton County Jail after he finished his cigarette.  In the sally port, Thorpe and Kendricks were "engaging [in] different conversations about different things," when Kendricks "said something to the degree, I don't mind talking to you and those other detectives, I don't want to talk with him without my attorney."  T66-67.  Thorpe asked him what he meant, and Kendricks explained that he did not mind talking to Thorpe and the other two detectives, but that he did not want to talk to Golphin without his attorney present.  T67; *see also* Gov't Exh. 15 at 03:04:25-03:0603.

Therefore, the Court concludes that Kendricks initiated the conversation that led to the resumption of questioning following his invocation.  T67.  Further, there is no evidence that the detectives badgered him in any way to get him to resume questioning after his earlier invocation.  As a result, the Government established that *Edwards v. Arizona*, 451 U.S. 477 (1981), was satisfied because Kendricks initiated the resumption of questioning.  *See Edwards*, 451 U.S. at 485 (following invocation, questioning could not resume unless the defendant "initiate[d] further communication, exchanges, or conversations with the police"); *see also United States v. Gomez*, 927 F.2d 1530, 1537

26

(11th Cir. 1991) (holding that after an accused invokes his right to counsel, interrogation must cease, and "*[o]nly* if the accused . . . voluntarily initiates further communications can the agents pursue more information and interrogation") (emphasis in original).

In addition, Kendricks's agreement to, in effect, waive his rights and again speak to the detectives after the sally port conversation was voluntary, in that the unrecorded colloquy in the sally port between Kendricks and Thorpe was repeated once the detectives and Kendricks were back in the interview room, and Kendricks stated that he would speak to Thorpe and the other two detectives but not Golphin, from whom he got "bad vibes." *See* Gov't Exh. 03:05:24.

Second, it is true that a statement may not be voluntary if it is " 'obtained by any direct or implied promises, however slight[. ]' " *United States v. Mercer*, 541 F.3d 1070, 1075 (11th Cir. 2008) (citation omitted). However, a possibility of a cooperation agreement does not make a defendant's statements involuntary. *Id.* at 1075-76 (citing *United States v. Davidson*, 768 F.2d 1266, 1271 (11th Cir. 1985)). In this case, a detective told Kendricks that if he cooperated, they would see what they could do. Such a comment about a mere possibility of consideration is not sufficient to make Kendricks's statements involuntary. *United States v. Nash*, 910 F.2d 749, 752 (11th Cir. 1990) (telling defendant "that cooperating

27

defendants generally 'fared better time-wise' " did not amount to illegal inducement); *Davidson*, 768 F.2d at 1271 (law enforcement assurance that "the accused's cooperation would be passed on to judicial authorities and would probably be helpful to him is not a sufficient inducement so as to render a subsequent incriminating statement involuntary"); *see also Graham*, 323 Fed. Appx. at 801 n.5 (citing with approval *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995), which held, "[T]here is no inconsistency between the required warning that a defendant's statement may be used against him and a further statement that cooperation can help him. Both are true.").

As a result, the Court concludes that there was no unconstitutional coercion applied to Kendricks that would make his October 6 or 12 statements involuntarily obtained. Therefore, the Court concludes that the totality of the circumstances demonstrates that Kendricks's waiver of his Fifth and Sixth Amendment rights was knowing, intelligent, and voluntary, and his subsequent statements were voluntarily obtained. Accordingly, the undersigned **RECOMMENDS** that Kendricks's motion to suppress statements, [Doc. 20], be **DENIED**.

## II.   *Motion to Suppress Fruits of the Cell Phone Search, [Doc. 30].*

On October 5, 2015, Atlanta Police Department ("APD") Investigator Tyrone

28

Dennis applied for and received a state search warrant for an Apple iPhone 6 seized from the front seat of the Monte Carlo that Kendricks was operating on October 1, 2015, and from which he fled.  T27, 37.  The warrant permitted the phone to be electronically extracted for incoming, outgoing, and missed call logs; text messages; e-mail; photographs; Internet history; cell tower locations on certain dates and times; and subscriber information, in order to locate evidence of violations of O.C.G.A. § 16-15-4(a).[6]  [Doc. 40-1 at 1].  The affidavit provided that Dennis had been a police officer for over eleven years and had been a member of the APD Gang Unit for two years, and in that capacity he investigated, documented and tracked gang members and gand-related crimes.  [*Id.* at 2].  The narrative portion of the warrant application provided, in relevant part, as follows:

> On January 10, 2015 Mr. Donovan "Peanut" Thomas was killed in a drive by shooting at 330 McDaniel St.  Thomas was a high ranking blood gang

---

[6]     O.C.G.A. § 16-15-4(a) makes it unlawful for a person employed by or associated with a criminal street gang to conduct or participate in criminal gang activity through the commission of any offense enumerated in paragraph (1) of Code Section 16-15-3."  O.C.G.A. § 16-15-3(1), in turn, defines "criminal gang activity" as "the commission, attempted commission, conspiracy to commit, or solicitation, coercion, or intimidation of another person to commit" various listed offenses, including "(J) Any criminal offense in the State of Georgia, any other state, or the United States that involves violence, possession of a weapon, or use of a weapon, whether designated as a felony or not, and regardless of the maximum sentence that could be imposed or actually was imposed."

29

member (BGCMB/IF Gang).  Thomas was a person of influence in the world of hip hop and our local gang community.  The incident drew suspicion among the local Blood gang members that Thomas was killed by one of local blood sets YSL/30 Deep.  Sense [*sic*] then the Atlanta Police Gang Unit has documented 38 incidents as retaliation from this one death.  The YSL/30 Deep Gang and Inglewood Family Bloods have shot at each other, the homes of rival gang family members, and at anyone associated with the members of these gangs.

On 9/26/15 a drive by shooting occurred at 249 Milton Av SE when it is suspected that rival IF Gang Blood Gang Members attempted to shoot YSL/30 Deep Gang member Shannon Stillwell/Jackson.  The suspects fired multiple rounds into the vehicle in which Stillwell/Jackson was riding in striking Tiara Jones the driver in the face, causing her to crash and flip approximately 4-5 times.  She was pronounced deceased on the scene.  The front passenger Chakoia Duncan suffered a crushed right leg and will have to have the leg amputated at a later date.  Mr. Shannon Stillwell/Jackson, the back passenger suffered a collapsed lung and broken ribs.  This was the third attempt on his life in the last few weeks.

Deamonte "Yak" Kendricks and Martinez "Duke" Arnold are both documented YSL/30 Deep Gang members.  The two were arrested on 10/1/15 at approximately 1:19 am after they got into a high speed chase with Atlanta Police patrol units and crashed a short time later.  Inside of the vehicle in which they crashed were two firearms, one handgun was recovered, a .40 caliber handgun and a AK-47 assault rifle which is consisted [*sic*] with the weapons used in the retaliatory shootings. The .40 Caliber pistol was reported stolen out of Atlanta, Ref APD CS#15-230-1517.

Both subjects had on their person a cellphone when they were taken into custody. A[n] Apple [iP]hone 6, black in color, IMEI#354444064372222, FCC ID: BCG-E2816A, phone belonging to Martinez "Duke" Arnold and a[n] Apple [iP]hone 6, black In color, IMEI35437606852152, FCC I: BCG-E2817A belong[ing] to Mr. Deamonte "Yak" Kendricks, who is a

30

convicted felon.  Mr. Kendricks became a convicted felon on 5/15/15, out of Arizona for possession of drugs and shoplifting, and were [*sic*] not in legal possession of the above mentioned firearms.  The suspects were wearing dark colored clothing, and a red and black bandanna was located on Mr. Kendricks neck when he was arrested.  The area in which Mr. Kendricks and Mr. Martinez were first spotted by patrol units is a known IF Gang area.  It is believed that these two individuals were attempting to retaliate for the shooting which occurred on 9/26/15.

Both suspects attempted to elude capture after they were stopped and ran from the patrol units.  The phone will be taken to the Atlanta Police Cyber Crimes Unit and a[n] electronic extraction will be done on the phone as both suspects are under investigation for the 1/10/15 shooting of the rival IF Gang member Mr. Donovan Thomas, as well as the December 2014 shooting at the Midtown Movie Theat[er], as well as other incidents that remain unsolved.  We are currently investigating 38 incidents between the YSL/30 Deep Bloods and the IF Gang (Inglewood Family Bloods), and with Mr. Kendricks cellphone (Apple [iP]hone 6, black in color, IMEI#35437606852152, FCC I: BCG-E2817A belong to Mr. Deamonte "Yak" Kendricks, who is a convicted felon, Mr. Kendricks), I hope to extract evidence such as his location during the times of some of our retaliatory shootings, text messages, call times, and photographs which may help establish his involvement in those crimes.

[Doc. 40-1 at 2 (typographical errors in original except where corrected to improve clarity or use correct proper name)].

Kendricks argues that the warrant application did not establish a nexus between the crime(s) under investigation and the cell phone, such that there likely would be evidence of the offenses on the phone.  [Doc. 40 at 1-2].  He points out that probable cause is only shown when the supporting affidavit establishes " 'a connection between

the defendant and the location to be searched; . . . [and] and a link between the location and criminal activity.' " [*Id.* at 1-2 (quoting *United States v. Joseph*, 709 F.3d 1082, 1099 (11th Cir. 2013); *United States v. Davis*, 313 F.3d 1300, 1303 (11th Cir. 2002)) (quotation altered by Court)].  While he acknowledges that the nexus can be established by the particular circumstances involved and need not rest on direct observation, [*id.* at 2 (quoting *United States v. Bradley*, 644 F.3d 1213, 1263-64 (11th Cir. 2011)], he contends no such link or nexus is present in this case.  Kendricks argues that the application described him as a gang member and shooting suspect, but did not indicate why the police expected evidence related to the shooting to be present on the cell phone, other than the affiant's "hope to extract" evidence from the phone.  [*Id.* at 2, 4].[7]

The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

---

[7] He also argues that the Court cannot apply the *Leon* good-faith standard because the Government did not raise it in its opening brief.  [Doc. 40-4].  The Court agrees and will not consider the argument.  *See Fogade v. ENB Revocable Trust*, 263 F.3d 1274, 1296 n.19 (11th Cir. 2001) (reiterating that arguments not raised in opening briefs are not properly before the Court unless they truly rebut the opposing party's contentions).

32

U.S. Const. amend. IV.  Thus, " '[t]he Fourth Amendment demonstrates a strong preference for searches conducted pursuant to a warrant.' "  *United States v. Bell*, 588 Fed. Appx. 875, 877 (11th Cir. Oct. 7, 2014) (quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996) (quotation omitted)).

Search warrants are presumed to be validly issued.  *Franks v. Delaware*, 438 U.S. 154, 171 (1978).  The defendant bears the burden of establishing that the warrant was defective or executed improperly.  *Id.*; *United States v. Van Horn*, 789 F.2d 1492, 1500 (11th Cir. 1986); *United States v. Marx*, 635 F.2d 436, 441 (5th Cir. Unit B Jan. 27, 1981)[8]; *United States v. Osborne*, 630 F.2d 374, 377 (5th Cir. 1980).[9]

For a search warrant to be valid, it must be supported by probable cause.  *United States v. Leach*, 498 Fed. Appx. 915, 916 (11th Cir. Nov. 21, 2012) (citing Fourth Amendment).  Whether the search warrant affidavit establishes probable cause is a question of law.  *United States v. Miller*, 24 F.3d 1357, 1360 (11th Cir. 1994).  Probable

---

[8]     The Eleventh Circuit has adopted as binding all decisions issued by a Unit B panel of the former Fifth Circuit. *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).

[9]     In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

33

cause to support the issuance of a search warrant exists when the totality of the circumstances allows a conclusion that there is a fair probability of finding contraband or evidence at a particular location. *See United States v. Noriega*, 676 F.3d 1252, 1261 (11th Cir. 2012); *United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009); *United States v. Gonzalez*, 940 F.2d 1413, 1419 (11th Cir. 1991). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts[.]" *Illinois v. Gates*, 462 U.S. 213, 232 (1983); *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999). "[P]robable cause deals 'with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Gates*, 462 U.S. at 241 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). Moreover, "[p]robable cause does not require overwhelmingly convincing evidence, but only 'reasonably trustworthy information.' " *United States v. Angulo-Hurtado*, 165 F. Supp. 2d 1363, 1376 (N.D. Ga. 2001) (quoting *Ortega v. Christian*, 85 F.3d 1521, 1524 (11th Cir. 1996)). However, an affidavit will be found deficient if it contains merely conclusory allegations and fails to provide sufficient information in order for the judge to conclude "that evidence or contraband will probably be found at the premises to be searched." *United States v. Martin*, 297 F.3d 1308, 1314

34

(11th Cir. 2002) (internal quotation marks omitted).  That is,  conclusory statements in a search-warrant affidavit that do not have sufficient factual support will not sustain a probable-cause finding.  *Gates*, 462 U.S. at 239 ("Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others.  In order to ensure that such an abdication of the magistrate's duty does not occur, courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued.").

The task of the issuing judge in determining whether to issue a warrant "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Gates*, 462 U.S. at 232; *United States v. Jiminez*, 242 F.3d 1243, 1248 (11th Cir. 2000); *see also United States v. Somers*, 591 Fed. Appx. 753, 756 (11th Cir. Nov. 14, 2014).

In deciding whether to issue a search warrant, the issuing judge may rely upon the opinions and conclusions of an experienced law enforcement agent-affiant, *United States v. Robinson*, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995), since "[c]onduct innocent in the eyes of the untrained may carry entirely different 'messages' to the experienced

35

or trained observer." *United States v. Gonzalez*, 969 F.2d 999, 1004 (11th Cir. 1992) (quoting *United States v. Fouche*, 776 F.2d 1398, 1403-04 (9th Cir. 1985)); *see also United States v. Kirk*, 781 F.2d 1498, 1505 (11th Cir. 1986) ("Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number.") (citations omitted).

Further, to justify a search, the circumstances must indicate why evidence of the alleged illegal activity likely will be found in a particular place. *Gates*, 462 U.S. at 238; *Warden v. Hayden*, 387 U.S. 294, 307 (1967); *United States v. Griffin*, 555 F.2d 1323, 1325 (5th Cir. 1977). The affidavit therefore "must establish a nexus between the place to be searched and things to be seized, such that there is a substantial basis to believe that the things to be seized will be found in the place searched." *Ellison v. Balinski*, 625 F.3d 953, 958 (6th Cir. 2010). Moreover, "the nexus between the objects to be seized and the premises searched can be established from the particular circumstances involved and need not rest on direct observation." *United States v. Lockett*, 674 F.2d 843, 846 (11th Cir. 1982); *see also United States v. McKinney*, 758 F.2d 1036, 1043 (5th Cir. 1985) (noting that the nexus between the place to be searched and the items to be seized may be established either by direct evidence or " 'normal inferences as to where the articles sought would be located[,]' " and the court stated that, "[i]n

36

determining whether a magistrate has drawn a 'normal inference' that evidence, fruits or instrumentalities of crime might be found at a given location, we have considered both the distance between the criminal activity . . . and the premises to be searched and the nature of the criminal activity") (citation omitted).

Finally, "probable cause must exist when the magistrate judge issues the search warrant," *United States v. Santa*, 236 F.3d 662, 672 (11th Cir. 2000) (quoting *United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994)); because a search is not to be made legal by what it turns up. *United States v. Di Re*, 332 U.S. 581, 595 (1948).

Then, the task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the issuing judge's decision to issue the warrant, *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984), affording "great deference to judicial determination of probable cause to issue a search warrant," *Robinson*, 62 F.3d at 1331  (citing *Gonzalez*, 940 F.2d at 1419).  Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable-cause determinations. *Gates*, 462 U.S. at 236-37 (citing

37

*United States v. Ventresca,* 380 U.S. 102, 109 (1965)); *see also Miller*, 24 F.3d at 1361. As the Supreme Court has instructed, "[a]lthough in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Upton*, 466 U.S. at 734 (quoting *Ventresca*, 380 U.S. at 109).

Here, probable cause existed to show the requisite nexus between the violent gang activity being investigated under O.C.G.A. § 16-15-4(a) and Kendricks's cell phone. The affidavit showed that Kendricks was a gang member, he was in a vehicle with another gang member, and his gang was in a retaliatory dispute with another gang. The vehicle from which he fled contained the cell phone, along with a .40 caliber handgun and an AK-47 assault rifle, weapons the affiant deemed consistent with prior retaliatory shootings. One such shooting involving members of Kendricks's gang occurred four days prior to the October 1 incident, and the weapons, how Kendricks was dressed, and the fact that Kendricks was in the rival gang's territory reasonably led Dennis to conclude that Kendricks and Arnold were seeking to retaliate for the September 26 shooting. Since both Kendricks and Arnold possessed cell phones, given these circumstances, it was likely that, at a minimum, evidence that they communicated

38

with each other and others about the rivalry and possible retaliatory acts, including acts of retaliation that already had occurred, would be contained on Kendricks's cell phone. Thus, it made perfect common sense for the  the issuing judge to infer that information related to these acts would be found in or on the phone. *See Riley v. California*, --- U.S. ----, ----, 134 S. Ct. 2473, 2489-90 (2014) (recognizing that cell phones are ubiquitous instruments of modern life and have immense storage capacity, including contacts and historic location information); *United States v. Brewer*, No. 1:13-CR-13-03, 2015 WL 2250150, at *4 (M.D. Pa. May 12, 2015) (holding that reasonable for magistrate judge to infer that information related to  presence at the robbery would be found in cell phone) (citing *Riley*).

Thus, the Court concludes that the warrant was supported by an adequate nexus between the cell phone and crimes under investigation, and therefore, Kendricks's motion to suppress, [Doc. 30], should be denied.[10]

_____

[10]     The Government does not appear to expressly argue that Kendricks lacked a legitimate interest of privacy in the cell phone because he abandoned it by fleeing the Monte Carlo, arguing abandonment only in response to Kendricks's motion to suppress the contents of the vehicle generally.  [*See* Doc. 34 at 21-23].  Thus, while the Government alternatively argued that even if Kendricks did not abandon the Monte Carlo the weapons seized were observed in plain view, [*id.* at 23], it made no such alternative argument as to the cell phone.  [*See id.* at 31-32].

(continued...)

AO 72A
(Rev.8/8
2)

## III.   Conclusion

For all the reasons stated above, the undersigned **RECOMMENDS** that Kendricks's motions to suppress statements, [Doc. 20], and fruits of the cell phone search, [Doc. 30], be **DENIED**.  The Clerk is **DIRECTED** to show that Kendricks's motion to suppress, [Doc. 19], is **WITHDRAWN**.

---

[10](...continued)

If the District Court disagrees with the undersigned's construction of the Government's papers and concludes that the Government's briefs do raise the contention that Kendricks' abandoned any interest in the cell phone by leaving it in the Monte Carlo when he fled from the vehicle, then there is support in the case law for denying Kendricks' motion to suppress due to a lack of a legitimate expectation of privacy in the phone.  *See United States v. Sparks*, 806 F.3d 1323, 1329, 1339 (11th Cir. 2015) (defendants abandoned privacy interest in cell phones left at store); *see also United States v. Foster*, 65 Fed. Appx. 41, 46 (6th Cir. May 5, 2003) ("By the time the officers confiscated the phone, however, the defendant had fled from the scene and had abandoned the vehicle he was driving.  Such abandonment extinguishes any reasonable expectation of privacy the defendant might once have had in the property."); *United States v. Hanner*, No. 2:05-cr-0385-02, 2007 WL 1437436, at *5 (W.D. Pa. May 14, 2007) (defendant held to have abandoned cell phone when he consciously "dropped" it out of concern he was in trouble).

40

The Court has now ruled on all matters referred to it, and has not been advised of any impediments to scheduling a trial.  Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED AND DIRECTED**, this the 22nd day of August, 2016.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

41

AO 72A
(Rev.8/8
2)